SAMUEL WOLCOTT et al., Claimants, *v.* STATE OF NEW YORK, Defendant. (Claim No. 29339.)

Court of Claims, June 29, 1950.

*George H. Winner* and *John E. Sullivan* for claimants.

*Nathaniel L. Goldstein, Attorney-General (Douglas S. Rider* of counsel), for defendant.

LOUNSBERRY, P. J.   This claim arises from the Elmira Flood Protection Project and is in many respects similar to the case of *Miller* v. *State of New York* (199 Misc. 237).

The claimants were the owners of premises fronting on West Water Street, in the city of Elmira, and bounded westerly by Columbia Street and southerly by the Chemung River.   The east portion was occupied by a tile garage building, forty-three feet wide and seventy feet deep, to which the claimants added, between May and October, 1946, a cinder block building, seventy feet by seventy feet in dimension.   There still remained, between the west wall of the new building and Columbia Street, a substantial parking lot, on which were situate claimants' gas pumps.

The flood control project involved the construction of a flood wall along the bank of the river, at the rear of claimants' premises.   It was a Federal project, under sections 701–701t of title 33 of the United States Code, particularly sections 701a-1, 701b-2 and 701c, which vest jurisdiction over and prosecution of the work in the Department of the Army, but require the State to acquire the necessary lands and easements, and to take over and maintain the completed project.   Chapter 862 of the Laws of 1936, as amended, authorizes the State's participation in such projects and makes provision for the appropriation of the necessary lands and other rights.

In the present case the construction of the wall was performed by an independent contractor, under a contract with the Federal Government, subject to the supervision of the Army Engineers. The State was not a party to the contract and had no supervision of the work.

For the purposes of such project the State permanently appropriated a parcel of .023 acres lying immediately to the rear of the cinder block building.   It also appropriated temporary three year easements in two parcels, one of .007 acres and one of .028 acres, which together comprised the entire south end of the parking area.   Originally the .007 acre parcel was taken permanently but subsequently fee title was reconveyed

to the claimants, reducing the appropriation to the status of temporary easement. The purpose of the temporary easements was to afford access and storage area for the contractor's equipment but the evidence indicates that the contractor also used freely the unappropriated area to the front, rendering it virtually useless to the claimants. It should also be mentioned that the appropriation originally intended was modified and reduced so as not to include any of the area where claimants intended to and did erect the cinder block addition.

After having first erected a cofferdam out in the river, the contractor, in April of 1947, drove sheet piling along a line varying from three and one-half to six and one-half feet from the rear wall of the cinder block building. The piling was driven about twenty feet into the ground by means of a 5,000 pound power hammer, causing considerable vibration. Subsequently, the area between the piling and the coffer dam was excavated to a depth of between fifteen and sixteen feet for the purpose of the erection of the flood wall.

At some point during the excavation work the claimants discovered that the rear wall of the cinder block building had shifted about two inches to the south and that both it and the west wall had cracked. They notified the contractor, who then braced the sheet piling to the cofferdam. The cracks continued to widen, however, and the floor cracked and plaster fell, all of which continued as late as April, 1949.

There is some dispute as to when the bracing was supplied. The plans required that the piling be braced near the top of the excavation and also when the excavation reached a depth of ten feet. The contractor testified that it was actually placed when the excavation was six to seven feet deep, upon receipt of the notice from the claimants concerning the damage to the walls. The claimants' witnesses, however, insisted that they did not even notice the damage until the excavation was nearly complete, and that the bracing was supplied subsequent to that time. Upon the whole, we believe the weight of evidence rests with the claimants on this point, and that the bracing was tardily placed.

There was also disagreement as to the type of soil encountered, but the better evidence indicates that it was gravel, especially at the lower levels. The contractor testified that it was impossible to prevent damage to the building since driving into such soil would cause settlement and consolidation. Incidentally, the plans for the piling were prepared by the contractor, although the overall plan was prepared by the Army Engineers,

The claimants produced an expert witness who stated that the damage to the building was definitely the result of settlement, which in turn was the result of the pile driving and the excavation. He believed the damage could have been avoided by underpinning the building and bracing it directly to the dam, or by other methods. The bracing provided in the plans might have sufficed, if timely applied. He was also of the opinion that the piling should have been braced above ground and the excavation made in short sections, with additional bracing as the work proceeded. In fact the excavation was performed in two lateral sections along the whole area.

The claimants contend that on these facts they are entitled to compensation not only for the land and easements appropriated, concerning which there is no dispute, except as to amount, but also for the damage to the building. Their position with respect to the latter item is that they had a right to the lateral support of their land in its natural state together with the right to have their building protected against the negligent performance of excavation work on the adjoining land by its owner or the contractor.

No statute or ordinance with respect to lateral support is applicable in this case and, therefore, the common-law rules apply. On the basis of the annotations in American Law Reports (50 A. L. R. 486; 59 A. L. R. 1252) the sections on lateral support in Corpus Juris Secundum (2 C. J. S., Adjoining Landowners, §§ 4–22), and the supporting New York cases hereinafter cited, we believe that those rules may be summarized as follows:

A landowner is absolutely entitled to the lateral support of his soil in its natural state by the soil of the adjoining lands. If an adjoining owner by excavation removes such support, causing the land to fall, he is responsible in damages, without regard to his degree of care, or to the fact that the work was performed by an independent contractor. (*Radcliff's Executors* v. *Mayor of Brooklyn*, 4 N. Y. 195; *Riley* v. *Continuous Rail Joint Co.*, 110 App. Div. 787, affd. 193 N. Y. 643; *Bergen* v. *Morton Amusement Co.*, 178 App. Div. 400.)

Such right of support does not extend, however, to structures placed on the land. Hence, subject to the limitations hereinafter stated, one who excavates on his own land is not liable for resulting damage to buildings on adjoining lands. The underlying principle is that one may not, by altering the natural condition of his land, deprive an adjoining owner of his right to use his land to the same extent as if the alterations had not

been made. (*Dorrity* v. *Rapp,* 72 N. Y. 307, and the cases cited above.)

If, however, the weight of the structure did not materially increase the lateral pressure, and thus was not a cause of the subsidence of the land, the adjoining owner who excavates may remain liable, not only for the damage to the land, but the damage to the structure as well. (*Riley* v. *Continuous Rail Joint Co., supra.*)

Further, an excavating owner, while under no obligation to support adjoining structures, must give the adjoining owner adequate notice of his intentions, so that the latter may take steps to protect himself, and must use reasonable skill, care and prudence in the prosecution of the work to avoid any unnecessary damage to the adjoining structures, in default of which he is liable therefor. Examples of such want of care are excavating in too great lateral sections, or leaving an excavation open an undue length of time. (*Austin* v. *Hudson Riv. R. R. Co.,* 25 N. Y. 334; *Dorrity* v. *Rapp, supra*; *Petillo* v. *Kennedy & Smith, Inc.,* 263 App. Div. 821.)

The owner is not liable for want of care, resulting in damage to an adjoining structure, on the part of an independent contractor, unless the owner fails to engage a competent contractor or interferes in the work, or the plan itself is defective and will result in unnecessary injury. (*Blake* v. *Ferris,* 5 N. Y. 48; *Berg* v. *Parsons,* 156 N. Y. 109; *Dorrity* v. *Rapp, supra.*)

In attempting to apply the foregoing principles to the present case, we are at once confronted with the peculiarity that the State, although the owner of the land on which the excavation took place, did not devise the plan, did not control, supervise or perform the work, and was not a party to the construction contract. Its relationship with the Federal Government, which actually fulfilled these various functions, does not fit neatly into any recognized category. The flood control statutes (U. S. Code, tit. 33, §§ 701–701t; L. 1936, ch. 862, as amd.) provide generally an arrangement whereby the Federal Government establishes and constructs a flood control project, while the State supplies the necessary lands and easements, removes obstacles, and otherwise co-operates, and, upon completion of the project, takes over and maintains it. Such a co-operative plan may perhaps best be described as a joint venture. Both parties are principals within their respective spheres, certainly neither can realistically be deemed the agent of the other.

The result, we think is that the State, as a participating principal in and beneficiary of the project remains subject to the

obligations of an owner, with respect to lateral support, despite its limited control in the particular situation.

Our decision in *Midolla* v. *State of New York* (46 N. Y. S. 2d, 345) which also involved a flood control project, is consistent with this conclusion. There the State appropriated a permanent easement in claimant's land, but not including any part of his building. In the course of the work the building was damaged. The State moved to dismiss any claim as to such damage on the ground that it was caused by the contractor. We held that the State not being a party to the contract, which was with the Federal Government, and having no control over the contractor, would not be liable for the contractor's acts unless at least the damage arose in the proper performance of the work. At the subsequent trial, the parties presented evidence only of the diminution in value of the property as a whole, taking into consideration essential alterations in the building necessitated by the taking of the easement, but excluding all damage to the building attributable to the operation of the contractor and an award was made accordingly. In substance, therefore, we found the State liable for damage resulting from the project, although outside the actual appropriation, but not for negligence of the independent contractor.

The conclusion thus drawn from the foregoing is that in the present case, the State will not be liable for damage to the building arising from the removal of lateral support in the course of the performance of a reasonable and proper plan of excavation, nor will it be liable if the damage arose through the negligence of the contractor. Liability can exist only if the weight of the building did not materially increase the lateral pressure and thus did not contribute to the subsidence of land or if the plan itself was defective in that it involved unnecessary risk of damage.

In the absence of evidence to the contrary, the presumption is that the weight of the structure did affect the lateral pressure. No such evidence to the contrary was presented. Neither was there any sufficient evidence that the plan itself was defective. The most likely cause of the difficulty was the failure of the contractor to brace adequately or to take sufficient steps to protect the claimants' building. For his acts the State is not liable.

The claimants suggest one other ground of liability, namely the failure of the State to give them adequate notice of the plans so that they could have taken measures to protect the building. It is not wholly clear exactly what notice was given, but from the fact that the appropriation plan was changed to meet their

convenience in the erection of the building, we are satisfied that they had reasonable advance warning. They built with knowledge that a flood wall was about to be constructed and should have informed themselves as to its possible effect on their proposed building. Furthermore, the State did not make the plans for the project and was probably unable to supply detailed notice of the precise work to be done. Finally, it is uncertain that under New York law, unlike many jurisdictions, there is any duty on the owner to give such notice. (*Dorrity* v. *Rapp, supra*.)

It follows that the claim as to damage to the building must be dismissed and the State's motion to strike from the record the evidence as to the amount of such damage must be granted.

There is no dispute as to the value of the parcel permanently appropriated. All witnesses fix it at $1,000. There is disagreement, however, as to the value of and damage from the temporary easement. The claimants were entirely deprived of the use of the rear portion, comprising roughly one fourth of the parking area, for a period of three years. They complain that they were also deprived of the use of the front portion by reason of the fact that the contractor freely occupied it with his equipment, but such trespass is not chargeable to the State. The loss of use of the rear portion, however, would undoubtedly have hindered the rental of the lot for gas station purposes, the use to which it was best adapted. Estimates of the reasonable rental value of claimants' entire lot vary from $350 to $2,400 per year. A similar lot across the street commanded a ground rent, for gas station purposes, of $3,540 per year. Our conclusion is that the reasonable value of the land subject to the easement, taking into consideration the resulting diminution in rental value of the remainder, was $1,500 per year, making, for the three-year period, a total of $4,500.

The claimants are therefore entitled to a total award against the State of New York in the amount of $5,500, with interest on $1,000 from May 27, 1947, to November 27, 1947, and from December 11, 1948, to the date of entry of judgment, and on the sum of $4,500 from November 15, 1946, to May 15, 1947, and from December 11, 1948, to the date of entry of judgment.

The court viewed the premises.

Findings in accordance with the above opinion may be submitted within fifteen days from the date hereof, otherwise this memorandum will be considered the decision herein.

Let judgment be entered accordingly.